UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
TRICIA R. PHILIPS,

                Plaintiff,

                                  **MEMORANDUM AND ORDER**

   - against -                            19-CV-1633 (RRM)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-----------------------------------------------------------------x
ROSLYNN R.  MAUSKOPF, United States District Judge.

      Tricia R. Philips brings this action against the Commissioner of Social Security

("Commissioner"), seeking review of the Commissioner's determination that she was not

disabled and, therefore, not eligible for Disability Insurance Benefits ("DIB") for the period of

May 7, 2013, through September 29, 2016.  Philips and the Commissioner now cross-move for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Pl.'s Mem. (Doc. No. 13); Def.'s

Mot. (Doc. No. 18).)  For the reasons set forth below, the Commissioner's motion is denied, and

Philips's motion is granted to the extent that it seeks remand.

## BACKGROUND

        Philips was 43 years old on the May 7, 2013, alleged disability onset date and 47

years old as of the November 26, 2018, ALJ decision.  Tr. 81.[1]  She is a high school graduate

with past work experience as a licensed practical nurse, home health aide, nurse assistant, and

personal care assistant.  Tr. 105, 134–35.  Philips was injured in a car accident on March 31,

2013; she attempted to return to work after the accident but stopped working due to back and

neck pain in May 2013.  Tr. 95–96, 302, 389.

---

[1] Citations preceded by "Tr." refer to the Administrative Record (Doc. No. 20) and use original pagination.  All other page numbers refer to ECF pagination.

<u>Medical Evidence</u>

Philips injured her neck and back in a car accident in March 2013.  Tr. 504.

Philips first saw Doctor of Osteopathy ("D.O.") Bowlva Lee, a pain management specialist, on April 8, 2013, for low back pain and right facial numbness, which had developed after the car accident.  Tr. 463–65.  Examination revealed 4/5 strength in the lower extremities and 5/5 strength in the upper extremities.  Tr. 464.  Her straight leg raising test was positive at 45 degrees on the right side, indicating nerve root sensitivity in the lumbar spine.  *Id*.  She had a diminished gait and reduced lumbar spine range of motion.  *Id*.  Dr. Lee recommended a series of lumbar epidural steroid injections ("LESI") to "decreas[e] pain levels while restoring function."  *Id*.  Dr. Lee wrote, "Patient has failed conservative therapy including physical therapy and NSAIDs [('non-steroid anti-inflammatory medications')]" and found that "Pain is severe and debilitating to patient's quality of life."  *Id*.  Dr. Lee also prescribed Meloxicam, a pain reliever, and recommended that Philips continue with physical therapy and chiropractic treatment.  *Id*.

An MRI of Philips's cervical spine conducted on April 23, 2013, showed disc herniations at C4-C5 and C5-C6.  Tr. 905.  On the same day, an MRI of Philips's lumbar spine showed posterior bulging at L3-L4 and L5-S1 encroaching on the neural foramina bilaterally, greater at L5-S1.  Tr. 906.  An MRI of Philips's thoracic spine showed midline herniation of the T9-T10 intervertebral disc indenting the ventral aspect of the thecal canal.  Tr. 907.

Philips returned to Dr. Lee on May 6, 2013.  Tr. 466–469.  She reported that she was receiving chiropractic treatment four times a week, which helped with her pain.  Tr. 466.  Philips was also taking cyclobenzaprine, a muscle relaxant, to manage pain.  *Id*.  Based on Philips's history, physical examination, and imaging results, Dr. Lee diagnosed Philips with lumbosacral radiculopathy, lumbar disc displacement, back sprain, neck sprain, cervical radiculopathy, and

cervical disc displacement. Tr. 467. Dr. Lee recommended that Philips continue physical therapy and chiropractic treatment, Meloxicam, and other "anti-inflammatory and analgesic agents as needed for pain." Tr. 468. Dr. Lee also administered the first LESI. *Id.*

Philips also injured her knee in the automobile accident. Tr. 508. An MRI of Philips's knee, taken May 10, 2013, showed a tear of the meniscus. Tr. 508, 549–550.

Philips returned to Dr. Lee on May 20, 2013, complaining of low back pain radiating into her right leg. Tr. 470–472. Dr. Lee administered a second LESI on June 10, 2013, Tr. 473–76, which Philips reported provided more than 50% improvement in function and motion, Tr. 483–486. Philips received another LESI on July 29, 2013. Tr. 479–82. She reported the LESI provided "good pain reduction" and that she was "much better and she is happy with the results. However, she states that the pain is returning." Tr. 488. Philips stated that she was taking tramadol, an opioid, for pain, and using ice packs. *Id.* She also reported knee pain with walking. *Id.*

On September 23, 2013, Philips returned to Dr. Lee, reporting continued low back, neck, and knee pain, as well as nausea and headaches. Tr. 491–95. Philips reported she was missing work due to the severity of her pain. Tr. 492. Straight leg raising tests were negative bilaterally. Tr. 493. Dr. Lee administered bilateral lumbar facet blocks at L3-L4, L4-L5, and L5-S1. Tr. 494.

An examination by Maxim Tyorkin, M.D., on October 2, 2013, showed that Philips had diminished range of motion in her right knee, pain with deep flexion, and parapatellar tenderness. Tr. 508. Dr. Tyorkin recommended continued physical therapy and pain management and suggested that Philips was a candidate for arthroscopic surgery. *Id.*

At a follow-up appointment with Dr. Lee on November 4, 2013, Philips reported that her neck pain was "not too bad" and that her headaches had been controlled with medication; she rated her lower back and knee pain at 7/10 and said her pain was no longer radiating. Tr. 497. She continued to do physical therapy three times per week and was taking NSAIDs for pain. *Id.*

Philips underwent an arthroscopic surgery of her right knee on December 12, 2013, to repair her torn meniscus. Tr. 1392–94. On December 16, 2013, Philips again saw Dr. Lee for her neck and low back pain, stating that her neck pain prevented her from carrying a pocketbook. Tr. 500–503. Philips walked with a cane due to her recent surgery and reported taking Vicodin for pain. Tr. 501.

On February 14, 2014, Philips saw Dr. Lee's coworkers, Jonathan Kuo, M.D., and Alexander Rances, D.O., complaining of neck, low back, and knee pain. Tr. 576–579. She said she no longer wished to take cyclobenzaprine for pain because it made her sleepy, but was taking Meloxicam. Tr. 578. On February 14, 2014, Philips returned to Dr. Kuo and Dr. Rances for bilateral lumbar facet blocks for lumbar and sacral degenerative disc disease and lumbar facet syndrome. Tr. 569–70. Philips reported at a follow-up appointment on February 17, 2014, that the blocks provided over 70% improvement in pain and function. Tr. 554. She reported wearing a back brace during her work as an ER transporter, a role that required her to lift over 100 pounds "constantly" and which made her pain worse. *Id.* Philips was still doing physical therapy twice per week and taking cyclobenzaprine for pain. Tr. 555.

At her next follow-up appointment with Dr. Rances, on April 14, 2014, Philips rated her pain at 8/10 and reported her back pain was worse with prolonged sitting, walking, and heavy lifting. Tr. 554. On examination, Philips had an antalgic gain but required no assistive devices. Tr. 555. She had reduced lumbar and cervical spine range of motion, 4/5 strength in her right

lower leg, and near-to-full strength in the other extremities.  Tr. 555.  She had intact reflexes and a negative straight leg raising test bilaterally.  *Id*.  She had stopped working because her employer did not have a light duty option for her.  Tr. 554.  She continued to do physical therapy twice a week.  *Id*.  Dr. Rances recommended a second set of diagnostic lumbar facet blocks, since Philips reported improvement from the first facet blocks.  Tr. 555.  He also prescribed Meloxicam.  *Id*.

On April 17, 2014, Philips saw neurosurgeon George DiGiacinto, M.D., for her neck and back pain.  Tr. 791–92.  On examination, Philips had decreased lumbar spine range of motion and mild restriction in the cervical spine with some palpable spasms in the lumbar spine.  Tr. 791.  She complained of pain on straight right leg raising bilaterally.  *Id*.  She had no muscle atrophy and no sensory changes.  *Id*.

Examination by pain management specialist Jung King, M.D., on May 30, 2014, revealed full motor strength and intact deep tendon reflexes in both upper and lower extremities.  Tr. 765.  Philips had decreased sensation to light touch in the right lower extremity and left upper extremity.  *Id*.

At her June 2, 2014, follow-up appointment with Dr. Rances, Philips reported that her neck and low back pain had been bothering her "a lot" and that she had not been able to sleep.  Tr. 559.  Philips described the pain as aching, sore, and throbbing, and said that pain would shoot into her shoulders and down both arms.  *Id*.  She had positive bilateral Spurling's tests, indicating nerve root compression in the cervical spine.  Tr. 560.  Dr. Rances administered a cervical epidural steroid injection.  Tr. 561.  On July 21, 2014, Philips told Dr. Rances that she had seen some initial improvement from the cervical injection, but her pain had started to return.  Tr. 566.  Dr. Rances opined that Philips was "100% temporarily disabled" and was unable to push or pull

over 25 pounds.  Tr. 567.  The doctor also opined that Philips could not sit or stand for more than one hour at a time and could not lift anything over 15 pounds.  *Id*.  Dr. Rances administered another cervical epidural spinal injection.  *Id*.

On August 28, 2014, Philips underwent a cervical discectomy and fusion of C4-C6, and arthrodesis with a cervical plate from C4-C6.  Tr. 767–68.  On September 8, 2014, Dr. DiGiacinto reported that Philips's wounds from that surgery were healing nicely and prescribed physical therapy.  Tr. 756.  Philips also returned to Dr. Tyorkin, who reported that she demonstrated slightly diminished range of motion in her knee and complained of pain at times.  Tr. 827.  Dr. Tyorkin also observed mild quadriceps atrophy.  *Id*.

On November 11, 2014, Dr. DiGiacinto said that although Philips had pinching in her neck, she was gradually improving after her surgery and still attending physical therapy.  Tr. 754.  The doctor opined that, due to Philips's continued complaints of lower back pain, she remained "totally disabled" and could not "return to the workforce in any capacity because of her cervical and lumbar spine."  *Id*.  He also referred Philips for a lumbar spine MRI.  *Id*.

On December 22, 2014, Dr. DiGiacinto reported that the MRI of Philips's lumbar spine performed that day showed "only bulging at L4-L5 and L5-S1."  Tr. 781.  The doctor recommended physical therapy as the "main form of treatment" and stated, "I do not feel at this point that pain management is indicated."  *Id*.

A CT-scan of Philips's cervical spine performed on March 24, 2015, showed "status post anterior fusion at C4-C6 with intact surgical hardware."  Tr. 779.  Dr. DiGiacinto stated that Philips's CT scan showed that her fusion was doing well.  Tr. 862.  She had reduced cervical and lumbar range of motion with muscle spasm.  *Id*.  She was using hydrocodone, an opioid, daily for pain and was finishing up physical therapy.  *Id*.  Dr. DiGiacinto wrote that Philips did not feel

she could return to work because of persistent neck and low back pain.  *Id*.  On July 7, 2015, Dr. DiGiacinto noted that Philips was taking hydrocodone on an as needed basis, and had stated that she was not ready to return to work.  Tr. 861.  Examination revealed reduced cervical and lumbar range of motion and moderate paraspinous spasm of the lumbar spine.  *Id*.  Dr. DiGiacinto wrote that Philips was totally disabled and had significant pain requiring the use of narcotic analgesics. Tr. 856.

On August 17, 2015, Dr. DiGiacinto opined that Philips could not perform even sedentary work.  Tr. 859.  On August 28, 2015, Dr. DiGiacinto wrote that Philips could not return to work because sitting for any period of time caused her neck and back pain, and that she might require lumbar surgery.  Tr. 857.  He also noted that Philips was having symptoms of what he suspected was carpal tunnel syndrome.  *Id*.  He opined that the periodic use of narcotic analgesics necessitated by her pain would make "it impossible for her to fulfill the requirements of even a sedentary job."  *Id*.

Also on August 28, Philips saw internist Dr. Yardly Pierre Jerome Shoulton, noting musculoskeletal pain.  Tr. 1480–81.  On examination, Philips had intact gait, intact reflexes, normal muscle strength throughout, and full range of motion throughout.  *Id*.

On October 8, 2015, Philips underwent an independent examination with Matthew Kern, M.D., a specialist in neurological surgery.  Tr. 845–50.  Philips had full muscle strength in her upper and lower extremities, intact reflexes, intact sensation, and no muscle atrophy.  Tr. 848–49.  She had normal lumbar spine range of motion and straight leg raise test was negative.  Tr. 849.  Dr. Kern opined that Philips could sit for one hour at a time; perform no prolonged standing or walking; perform no lifting, carrying, pushing, pulling, driving, climbing, stooping, crouching, or crawling; and never reach above shoulder level or below waist level.  *Id*.  He stated

that Philips could perform at most sedentary work, up to 40 hours per week.  *Id*.  In an addendum

dated October 29, 2015, Dr. Kern clarified his opinion, stating that Philips could not lift ten

pounds, could work at waist/desk level, and could use her hands/fingers for repetitive actions on

a frequent basis.  Tr. 842.

Electromyography ("EMG") and nerve conduction velocity studies performed on October

16, 2015, were suggestive of left C7 radiculopathy, with no evidence suggestive of peripheral

nerve entrapment or polyneuropathic or myopathic processes.  Tr. 851–55.

On November 3, 2015, Dr. DiGiacinto reported that Philips's cervical and lumbar

conditions were "under control and resolving."  Tr. 840.  He also stated that Philips "had been

totally disabled but is improved now to the point that I feel it is reasonable for her to undertake a

sedentary job that allows her to get up and move around periodically."  *Id*.  He also opined that

she could lift no more than 10 pounds.  *Id*.

On February 2, 2016, Dr. DiGiancinto noted that Philips's neck pain was "getting worse"

and referred her for a new MRI of the cervical spine.  Tr. 838.  The cervical MRI was performed

on February 22, 2016, and showed mild disc bulges at C3-C4 and C6-C7.  Tr. 835–36.  No spinal

cord compression was identified.  Tr. 836.  That same day, Philips returned to Dr. DiGiacinto,

who noted that the new MRI did not clearly show the origin of her increased neck pain.  Tr. 833.

He wrote that Philips was disabled secondary to residual pain status-post cervical fusion and

could not work in any capacity.  *Id*.  He expected this status to remain unchanged for another six

to nine months.  *Id*.

In a medical source opinion dated April 10, 2016, Tr. 895–901, Dr. DiGiacinto stated that

Philips would be drowsy due to her medications and would need to lie down during the day, Tr.

897–98.  She could sit for two hours continuously and four hours total and stand/walk one hour

each continuously and four hours total.  Tr. 899.  She could lift only up to five pounds and never

squat, crawl, or climb.  *Id*.  She could occasionally reach or bend and never perform repetitive

manipulation.  Tr. 899–900.

On May 16, 2016, Philips told Dr. DiGiacinto that she was attending vocational

rehabilitation and was working two days a week at a senior citizen center answering phones.  Tr.

931.  She said she could tolerate lifting up to 10 pounds, but when she lifted and carried 20

pounds, she had low back pain.  *Id*.  On examination, there was decreased ankle jerk on the right,

and slightly decreased sensation in the L5 and S1 dermatomes on the right.  *Id*.  Straight leg

raising was positive on the right.  *Id*.

On June 10, 2016, Dr. DiGiacinto reiterated that Philips was totally disabled, needed

"assistance with activities of daily living," and could not work in any capacity.  Tr. 930.  On June

14, 2016, Dr. DiGiacinto referred Philips to pain management for evaluation of lumbar

radiculopathy.  Tr. 929.

Philips began a course of physical therapy with Daniel Khaimov, M.D., in June 2016.  Tr.

937–61.  On June 22, 2016, Dr. Khaimov administered a LESI.  Tr. 1786.  Philips reported 50%

improvement in pain and improved walking.  *Id*.

Non-Medical Evidence

In a function report dated June 11, 2016, Philips reported that she prepared meals weekly,

read, cared for her personal needs, watched television, browsed the internet, and did her physical

therapy exercises.  Tr. 409.  She remembered to take her medications.  Tr. 410.  She reported

pain when getting dressed and undressed and when bathing, and required some assistance with

household chores due to right hand pain.  Tr. 411.  She could travel independently and use public

transportation.  *Id*.  She shopped weekly for food and clothes.  Tr. 412.  She could manage her

finances.  *Id.*  Philips attended church once or twice a week and spokes to friends on the telephone daily.  Tr. 413.  She stated that she could finish what she started and follow spoken and written instructions.  Tr. 415.

Prior Hearing Testimony, First ALJ Opinion and Remand

Philips filed her application for DIB on March 28, 2014, alleging disability as of May 7, 2014, due to spinal and knee injuries and neck sprain.  Tr. 302–08, 389.  This application was denied.  Tr. 234–37.  Philips then requested a hearing.  Tr. 210.

Philips, represented by counsel, appeared at a hearing before Administrative Law Judge ("ALJ") Marilyn P. Hoppenfeld on May 12, 2016.  Tr. 71.  Philips testified that she used public transportation to travel to the hearing.  Tr. 86.  She stated that she met with a vocational counselor in May 2016 and she was to start training for a degree in human services.  Tr. 87.  She occasionally watched television and shopped.  Tr. 129.  Philips traveled to Florida in 2014 and visited two amusement parks, where she "walked around a little."  Tr. 130.

On August 19, 2016, Philips returned for a supplemental hearing before ALJ Michael P. Friedman.  Philips testified that she took over-the-counter medication for her neck and back pain but avoided stronger medication because in the past it made her forgetful and groggy.  Tr. 174.  She reported that she shopped, read, watched television, and cooked "a little."  Tr. 176.  She also used public transportation.  *Id.*  She stated that she had been volunteering two days per week, six hours per day, answering phones, but that she had stopped doing that work because she "was getting a lot of pain sitting down."  Tr. 177–78.

On September 28, 2016, ALJ Friedman issued an unfavorable decision, finding that Philips was not disabled.  Tr. 52–63.  The 2016 decision became the final decision of the Commissioner on April 6, 2017.  Philips thereafter commenced a civil action challenging the

2016 decision in the Eastern District of New York. *See Philips v. Berryhill*, 17-CV-3355

(MKB). By stipulation and order dated November 30, 2017, the case was remanded to the

Commissioner for further proceedings. 17-CV-3355, Doc. No. 16. On March 9, 2018, the

Appeals Council vacated ALJ Friedman's decision and remanded the case for further

administrative proceedings. Tr. 1074–75.

Additional Medical Evidence

The ALJ considered the following additional medical evidence upon remand. Tr. 1018.

On April 22, 2016, Philips went to the emergency room at Queens Hospital Center,

complaining of neck and back pain. Tr. 986–94. Philips reported she was taking ibuprofen and

methocarbamol, a muscle relaxant, for pain. Tr. 987. The attending physician prescribed

cyclobenzaprine. *Id*.

On April 27, 2016, Philips saw Dr. Shoulton with complaints of back and neck pain. Tr.

1465–67. On examination, she had lumbar tenderness radiating to both legs and paravertebral

spasm. Tr. 1467. Philips had an intact gait and intact reflexes, normal muscle strength

throughout, and full range of motion throughout. Tr. 1467.

On April 29, 2016, Philips went to the emergency room at Jamaica Hospital, complaining

again of back and neck pain. Tr. 909–26. The attending physician advised Philips to continue

on cyclobenzaprine and ibuprofen. Tr. 909.

On June 10, an MRI of Philips's lumbar spine showed stable minimal lumbar spondylosis

without significant spinal stenosis at any lumbar level. Tr. 933.

On July 13, 2016, Philips saw Dr. Shoulton for back and neck pain. Tr. 1460–62. She

denied any stiffness, loss of sensation, pain, or joint swelling. Tr. 1461. On examination, Philips

had an intact gait, intact reflexes, normal muscle strength throughout, and full range of motion

throughout. Tr. 1462. That same day, Philips had an MRI of her cervical spine. Tr. 962–63. The MRI showed stable postoperative changes at C4-C5 and C5-C6 in comparison to the February 22, 2016 cervical MRI, and also showed stable disc bulges at C3-C4 and C6-C7 without new disc herniations. Tr. 963. It also showed mild cervical spondylosis at C5-C6 with mild foraminal narrowing. *Id*.

On August 19, 2016, Dr. Khaimov administered a cervical epidural steroid injection. *Id*.

In a medical source statement dated August 24, 2016, tr. 966–72, Dr. Khaimov opined that Philips would need to lie down every 30 minutes during the day. Tr. 968. She was "groggy" and had a lack of concentration due to her medications. Tr. 969. She could sit or stand twenty minutes at a time, up to six times a day, and walk ten minutes at a time up to three times a day. Tr. 970. She could only lift up to five pounds and never squat, crawl, or climb. *Id*. She could occasionally bend or reach and never perform repetitive manipulation bilaterally or repetitive grasping on the left. Tr. 970–71. Also on August 24, 2016, Dr. DiGiacinto repeated his opinion that Philips would be drowsy due to her medications and would need to lie down during the day. Tr. 976–77. He opined that Philips could sit one-half hour at a time and one to two hours total, stand one-half hour at a time and one hour total, and walk fifteen minutes at a time for one hour total. Tr. 978. She could lift only up to five pounds occasionally and never reach, bend, squat, crawl, or climb. *Id*. She could occasionally grasp and never perform repetitive manipulation. Tr. 979.

On August 29, 2016, Dr. Khaimov administered another cervical epidural steroid injection and an injection to treat trochanteric bursitis in Philips's left hip. Tr. 1784–85.

On December 28, 2016, Philips saw neurologist Marina Neystat, M.D., complaining of pain in her neck and lower back, as well as episodes of dizziness once or twice per week. Tr.

1182.  Dr. Neystat administered an intravenous magnesium infusion for headache prevention.

Tr. 1185–86.  Philips was taking nortriptyline, a nerve pain medication, for pain; Dr. Neystat

increased her dose from 10mg to 25 mg.  Tr. 1186.

On February 8, 2017, Philips returned to Dr. Neystat for an intramuscular injection of

Toradol, an NSAID.  Tr. 1190.  The following day, on February 9, 2017, Dr. DiGiacinto

performed a second cervical discectomy on DiGiacinto and prescribed her hydrocodone for pain

after surgery.  Tr. 1194, 1230-1390.  The second surgery revealed a "significant amount of scar

tissue" from the previous surgery, which was cleared.  Tr. 1265–67.

On June 20, 2017, Philips returned to Dr. Neystat for another magnesium injection.  Tr.

1199.  Philips had positive Tinel's signs on both wrists, indicating carpal tunnel syndrome.  Tr.

1196.

Consultative examiner Dr. Chaim Schtock, D.O., saw Philips for an orthopedic exam on

June 11, 2018.  Tr. 1122–33.  Dr. Schtock noted decreased sensation in the left upper extremity

and limited range of motion in the lumbar spine.  Tr. 1124.  Dr. Schtock opined that Philips

retained the capacity to perform light work, with her left upper extremity limited to frequent

reaching, handling, and fingering.  Tr. 1126.

On September 7, 2018, Dr. Khaimov completed a function report stating, in relevant part,

that Philips was able to stand, sit, or walk for less than two hours in an eight-hour workday and

that she experienced severe pain and burning in her arms and hands due to nerve pain.  Tr. 1617–

1620.  On September 18, 2018, Dr. Neystat completed a function report stating, in relevant part,

that Philips was able to stand or walk for less than 2 hours in an eight-hour workday and could

sit for only two hours in an eight-hour workday.  Tr. 1621.  Dr. Neystat also noted that Philips

had significant limitations with reaching, handling, or fingering due to her carpal tunnel

syndrome. Tr. 1622. An EMG confirmed bilateral neuropathy at the wrists, consistent with carpal tunnel syndrome, on September 21, 2018. Tr. 1644–47.

Third Administrative Hearing and Expert Testimony

On October 26, 2018, Philips appeared for a third hearing, again before ALJ Friedman. Tr. 1034. During this hearing, Philips complained of neck pain and said that physical therapy occasionally helped her pain. Tr. 1037. She stated that she occasionally cooked, watched television, and read. Tr. 1039–40. She also complained of bilateral hand pain, stated that her neck pain interfered with her sleep, and that she often took naps during the day. Tr. 1040–42. She testified that she had withdrawn from her in-person classes for a semester because "by the time I got to school I'm already fatigued and sleepy, and I couldn't sit in a little chair, they don't have accommodations and I can't bend my head to the right." Tr. 1043–44. However, she also testified that she was taking a "couple" of classes online. Tr. 1040, 1043–44.

Vocational Expert ("VE") Jeffrey Nocera also testified at the third hearing. Tr. 1047–52. The ALJ described the following hypothetical individual to the VE: limited to occasional bending; no squatting, climbing, and crawling; no exposure to unprotected heights; and moderate restriction to marked temperature and humidity changes. Tr. 1049–50. The VE testified that such an individual could perform the jobs of information clerk, Dictionary of Occupational Titles ("DOT") 237.367-022; receptionist, DOT 237.367-038; and appointment clerk, DOT 237.367-010. Tr. 1050. The VE stated that the individual could still perform the job of information clerk if she was limited to occasional reaching. *Id*. The VE stated that all of the aforementioned jobs allow an individual to have two 15-minute breaks and one 30-minute break during the workday during which the individual could lie down. Tr. 1050–51.

<u>The ALJ's Decision</u>

On November 26, 2018, ALJ Friedman issued a partially favorable decision, finding Philips became disabled on September 29, 2016. Tr. 1010–24. After determining that Philips met the insured status requirements of the Social Security Act through December 31, 2017, the ALJ followed the familiar five-step process for making disability determinations, which the Second Circuit has described as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)).

At step one, the ALJ found that Philips had not engaged in substantial gainful activity since May 7, 2013, the alleged onset date. Tr. 1017. At step two, the ALJ found that Philips had the following severe impairments: status post cervical discectomy and fusion, lumbar radiculopathy, and status post right knee arthroscopy. *Id*. At step three, the ALJ found that Philips did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. The ALJ specifically considered Listing 1.04, disorders of the spine. *Id*.

At step four, the ALJ found that Philips had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except she could sit, stand, and walk four hours in an eight-hour workday; she needed a sit-stand option "every 30 minutes or more;" she could not lift more than five pounds; and she could not engage in repetitive pushing or pulling of arm or leg controls or repetitive manipulation with her hands. *Id*.

In reaching the decision regarding Philips's RFC, the ALJ stated that he gave "great weight" to the opinion of treating physician Dr. DiGiacinto as set forth on April 10, 2016, "because it appears to be consistent with the treatment records." Tr. 1018–19. However, the ALJ noted that Dr. DiGiacinto's August 24, 2016, opinion "is drastically different from the previous opinion only a few months prior, with no justification," and gave this opinion minimal weight. Tr. 1019. The ALJ also found that Dr. Khaimov's opinion that Philips "is severely restricted in ability to sit, stand, and walk to well below the level required for sedentary work" was "not supported by the objective medical records and are given minimal weight." *Id*. Further, the ALJ gave little weight to the "conclusory" opinions of "various physicians" who "have opined throughout the record that the claimant is 'totally disabled.'" *Id*.

The ALJ further found that beginning on September 29, 2016, Philips had the following severe impairments: "cervical surgery times two, lumbar radiculopathy, and status post right knee arthroscopy." *Id*. He found that, starting on that date, Philips had an RFC of less than sedentary work as defined in 20 C.F.R. § 404.1567(a), except that she could sit, stand, and walk four hours in an eight-hour workday; she needed a sit-stand option every 30 minutes or more; she could not lift more than five pounds; she could not engage in repetitive pushing or pulling of arm or leg controls or repetitive manipulation by hands; and she would need to be allowed to be off-task for "more than 20 percent of the workday." Tr. 1020.

In reaching this determination, the ALJ noted that Philips's cervical surgery in 2017 had uncovered scar tissue formation from the 2014 surgery, which "obviously could produce pain." *Id.* Though the ALJ noted that "it is not precisely known when scar tissue from the first surgery formed and caused discomfort, the undersigned gives the claimant the benefit of the doubt and assumed it must go back a considerable time, to approximately September 29, 2016, which is a little more than five months prior to the second surgery and the day after the prior Administrative Law Judge decision." *Id.* The ALJ further stated that he gave great weight to Dr. Neystat's opinion that Philips could perform no work, and no weight to Dr. Schtock's opinion because it failed to address "likely work interruptions due to pain as validated by surgery and pain treatment records." Tr. 1021. Finally, the ALJ gave great weight to the "new opinion" of Dr. Khaimov "as of the established onset date because it becomes consistent with the medical evidence of record." Tr. 1021.

The ALJ determined that prior to September 29, 2016, Philips was unable to perform any of her past relevant work. Tr. 1021–22. He further stated that "prior to September 29, 2016, transferability of job skills is not material to the determination of disability because using the Medical-Vocation Rules as a framework supports a finding that the claimant is 'not disabled' whether or not the claimant has transferable job skills." Tr. 1022. However, the ALJ determined that after September 29, 2016, Philips was not able to transfer job skills to other occupations. *Id.*

Finally, at step five, the ALJ determined that prior to September 29, 2016, Philips retained the ability to work a variety of jobs that existed in significant numbers in the national economy, including information clerk, receptionist, and appointment clerk. Tr. 1022–23. At this step, the ALJ relied upon VE testimony that these jobs would provide two 15-minute breaks and one 30-minute break during which Philips could lie down, given "claimant's need to lie down

during the day due to pain and drowsiness." Tr. 1023. No jobs existed in the national economy in which Philips could be employed after September 29, 2016. Tr. 1023–24. Accordingly, the ALJ determined that Philips was not disabled from May 7, 2013, until September 29, 2016, but was disabled as of the latter date. Tr. 1024.

On April 6, 2017, the Appeals Council denied Philips's Request for Review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner, pursuant to 42 U.S.C. § 405(g). Tr. 1–4. This action followed.

The Instant Appeal

Philips and the Commissioner now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In her Memorandum of Law, Philips argues that the ALJ had no legitimate medical basis for his finding that Philips's impairments became disabling only as of September 29, 2016, and the ALJ should have consulted a medical expert to determine the onset date. (Pl.'s Mem. at 8–10.) Additionally, Philips argues that the ALJ erred at step five in finding that Philips could perform semi-skilled work without first performing a transferability of skills analysis. (*Id*. at 6–7.) Finally, Philips asserts that the ALJ made "significant legal errors" in evaluating the medical opinion evidence, such as failing to incorporate into the RFC either Dr. DiGiacinto and Dr. Khaimov's opinions that Philips would need to lie down throughout the workday, despite giving "great weight" to both opinions. (*Id*. at 10–15.)

In response, the Commissioner argues that the ALJ's RFC determination was supported by substantial evidence, including examination findings that were inconsistent with a need to rest more than is customary during the workday, including the examination findings of Dr. Kuo, Dr. Rances, and Dr. Kern that Philips had full muscle strength and intact reflexes. (Def.'s Mem.

(Doc. No. 19) at 9–11.)  The Commissioner also points to Dr. DiGiacinto's reports in April 2015 and November 2015 that Philips's cervical fusion was "doing well" and that her conditions were "under control and resolving," as well as Philips's trip to Florida, as additional evidence supporting the RFC.  (*Id*. at 11.)  The Commissioner also argues that an ALJ is not required to consult a medical expert to determine the onset date of disability, as the decision whether to consult with a medical expert is always within the ALJ's discretion.  (*Id*. at 12–14.)  Rather, the RFC must be formulated based on the record as a whole.  (*Id*. at 14.)  Finally, the Commissioner argues that no regulation requires an ALJ to perform a transferable skills analysis, and the ALJ correctly found at step five that Philips could hold the jobs identified by the VE.  (*Id*. at 15–16.)

In reply, Philips points to 20 C.F.R. §§ 404.1568(d), 404.1565(a), and Soc. Sec. Ruling ("SSR") 82-41, which set forth multiple definitions and policy statements relating to semi-skilled work and transferability analyses, to argue that regulations require a transferability analysis in advance of a finding that a claimant can perform semi-skilled work.  (Pl.'s Reply (Doc. No. 17) at 4.)  Philips also argues that, though the Commissioner is correct that the regulations do not require an ALJ to consult a medical expert, SSR 18-01p does require the onset date to be supported by medical evidence, which was not the case here.  (*Id*. at 4–6.)  Finally, Philips argues that the Commissioner cannot now offer post hoc explanations for the ALJ's RFC determination, and that the ALJ erred by failing to evaluate the opinions of Dr. DiGiacinto and Dr. Khaimov or to incorporate Philips's need to lie down during the workday into the RFC.  *Id*. at 6–8.)

## STANDARD OF REVIEW

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. §

1383(c)(3).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner

is limited to determining whether the Commissioner's conclusions were supported by substantial

evidence in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc.*

*Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

The district court has the "power to enter, upon the pleadings and transcript of the record, a

judgment affirming, modifying, or reversing the decision of the Commissioner of Social

Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

"In determining whether substantial evidence supports a finding of the Secretary [now,

Commissioner], the court must not look at the supporting evidence in isolation, but must view it

in light of the other evidence in the record that might detract from such a finding, including any

contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera*

*v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies

only to the Commissioner's factual determinations.  Similar deference is not accorded to the

Commissioner's legal conclusions or to the agency's compliance with applicable procedures

mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles,

application of the substantial evidence standard to uphold a finding of no disability creates an

unacceptable risk that a claimant will be deprived of the right to have her disability

determination made according to the correct legal principles."  *Johnson*, 817 F.2d at 986.

However, where application of the correct legal principles to the record could lead only to the

same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration.  *Zabala v. Ast*rue, 595 F.3d 402, 409 (2d Cir. 2010).

<u>Eligibility for DIB</u>

A claimant must show that he is "disabled" in order to qualify for DIB.  *See, e.g.*, *Lugo v. Berryhill*, 390 F. Supp. 3d 453, 457 (S.D.N.Y. 2019).  In this context, disability means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  *Id.* § 423(d)(2)(A).  The term, "work which exists in the national economy," is defined to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  *Id.*

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step framework described above on page 15, above.  *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (quoting 20 C.F.R. §§ 404.1520(a)(4)(i) – (v)).  "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, *see*, *e.g.*, *Draegert v. Barnhart*, 311 F.3d at 472, and 'bears the burden of proving his or her case at steps one through four' of the sequential five-step framework…. *Butts*

*v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004)." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir.

2008). Nonetheless, "[b]ecause a hearing on disability benefits is a nonadversarial proceeding,

the ALJ generally has an affirmative obligation to develop the administrative record." *Id.*

(quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)).

## DISCUSSION

Disability Onset Date

     Social Security Ruling 18-01p, 2018 SSR LEXIS 2, governs the determination of

disability onset dates and is binding on the Commissioner. Determining the Established Onset

Date (EOD) in Disability Claims, Soc. Sec. Ruling ("SSR") 18-01p, 2018 SSR LEXIS (S.S.A.

Oct. 2, 2018); *see also* 20 C.F.R. § 402.35 ("Social Security Rulings . . . are binding on all

components of the Social Security Administration."). SSR 18-01p states,

> If we find that a claimant meets the statutory definition of disability and meets the
> applicable non-medical requirements during the period covered by his or her
> application, we then determine the claimant's [Established Onset Date ("EOD")].
> Generally, the EOD is the earliest date that the claimant meets both the definition
> of disability and the non-medical requirements for entitlement to benefits under
> title II of the Act or eligibility for SSI payments under title XVI of the Act during
> the period covered by his or her application.

2018 SSR LEXIS 2 at * 3. For "exacerbating and remitting impairments" that can be expected to

worsen over time, the ALJ will determine "the first date" that the claimant met the statutory

definition of disability. "The date that the claimant first met the statutory definition of disability

must be supported by the medical and other evidence and be consistent with the nature of the

impairment(s)." *Id*. at * 14–15. Where a claimant has both a traumatic impairment, such an

injury from an automobile accident, and a non-traumatic or exacerbating and remitting

impairment,

> we will consider all of the impairments in combination when determining when
> the claimant first met the statutory definition of disability. We will consider the

date of the traumatic event as well as the evidence pertaining to the non-traumatic
or exacerbating and remitting impairment and will determine the date on which
the combined impairments first caused the claimant to meet the statutory
definition of disability.

*Id*. at * 17–19.

"An arbitrary onset date selection will not be accepted by a reviewing court." *Ahisar v.*

*Comm'r of Soc. Sec.*, 14-CV-4134 (PKC), 2015 U.S. Dist. LEXIS 131674 at *8 (E.D.N.Y. Sept.

29, 2015). Courts have found "the date on which the claimant applied for SSI benefits, received

a consultative examination, or appeared before an ALJ at an administrative hearing" to be

arbitrary dates requiring remand. *McCall v. Astrue*, 05-CV-2042 (GEL), 2008 U.S. Dist. LEXIS

104067, at *63 (S.D.N.Y. Dec. 23, 2008).

Here, the Commissioner failed to comply with SSR 18-01p because the ALJ selected an

onset date that was arbitrary and not supported by medical evidence. In his decision, the ALJ

wrote that though "it is not precisely known when scar tissue from the first [cervical] surgery

formed and caused discomfort, the undersigned gives the claimant the benefit of the doubt and

assumed it must go back a considerable time, to approximately September 29, 2016, which is a

little more than five months prior to the second surgery and the day after the prior Administrative

Law Judge decision." Tr. 1020. There is no medical reason to select the date following the first

ALJ decision. The record evidence shows that in April 2016, Philips went to two separate

emergency rooms due to her neck and back pain. An MRI taken on July 13, 2016, showed mild

cervical spondylosis at C5-C6 with mild foraminal narrowing, in addition to the disc bulges at

C3-C4 and C6-C7 shown in the MRI taken just a few months prior on February 22, 2016. EMG

results from October 16, 2015, suggesting left C7 radiculopathy, indicate that the scar tissue and

resulting pain could have been present even earlier. The ALJ provides no reason that this

medical evidence fails to support a finding of disability, nor is there anything in the record

demonstrating a change in Philips's condition in September 2016 as compared to the preceding months.

<u>RFC Determination</u>

The ALJ is responsible for assessing a claimant's RFC and, in so doing, must consider all relevant medical and other evidence, including any statements about what the claimant can still do provided by any medical sources. *See* 20 CFR 404.1527(d)(2). "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 SSR LEXIS 5, *20.

"Although [an] ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, [s]he [is] entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). This is because the ALJ's RFC assessment is not a medical opinion, but an administrative assessment of what a claimant can do based on the medical and non-medical evidence of record. 20 CFR 416.945(a); SSR 96-8p, 1996 WL 374184, at *3. In so doing, it is within the ALJ's discretion to resolve "genuine conflicts" in the evidence. *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("It is for the [Commissioner], and not this court, to weigh the conflicting evidence in the record"); *see also Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence."). Thus, "[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014).

Here, the ALJ failed to explain why he chose not to adopt the opinions of Dr. DiGiacinto and Dr. Khaimov that Philips would need to lie down throughout the workday. The ALJ gave "great weight" to the opinions of Dr. DiGiacinto and Dr. Khaimov, who both stated that Philips would need to lie down frequently throughout the workday. Dr. DiGiacinto stated in his April 2016 opinion that Philips would be drowsy during the day due to her medication and would therefore need to lie down. Tr. 897–98. Dr. Khaimov stated that Philips would need to lie down every 30 minutes because of her pain and because her medication made her "groggy." Tr. 969. Despite giving great weight to these two opinions, the ALJ did not include this restriction in Philips's RFC or explain why such a restriction was not adopted.

Further, the RFC determination was inconsistent with the record as a whole. Philips complained that her medications made her sleepy in February 2014, and even told Dr. Rances that she no longer wished to take cyclobenzaprine because of this side effect, though she continued to be prescribed this medication to manage her pain. She consistently testified, at two hearings, that she had trouble sleeping because of her pain and that her medications made her groggy, so she took frequent naps during the day. Dr. DiGiacinto provided two opinions, in April and August 2016, both stating that Philips would need to lie down frequently because her medications made her drowsy. The ALJ seemed to acknowledge his failure to include this well-documented limitation in the RFC when he said that Philips would be able to perform the jobs enumerated by the VE because all three of them provided short breaks throughout the day during which Philips could lie down. Indeed, the ALJ called this restriction "claimant's need to lie down during the day due to pain and drowsiness," suggesting that he was well aware that this additional limitation was necessary. Tr. 1023. Accordingly, the ALJ erred in failing to include this limitation in Philips's RFC.

<u>Transferability Analysis</u>

Philips argues that the ALJ erred in finding that she could perform semi-skilled work without first doing a transferability analysis. She cites 20 C.F.R. §§ 404.1568(d), 404.1565(a), and SSR 82-41, to argue that an ALJ must assess whether a claimant has transferable skills before finding that the claimant can engage in semi-skilled work. None of these sources support this proposition. Further, 20 C.F.R. § 404.1564(b)(4) states that a claimant with a high school education is generally considered to be capable of "semi-skilled through skilled work." Philips is a high school graduate. Accordingly, the ALJ did not err in failing to perform a transferability analysis before determining that Philips was capable of performing semi-skilled work.

## **<u>CONCLUSION</u>**

Federal regulations explicitly authorize a court reviewing decisions of the SSA to order further proceedings when appropriate. 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). Remand is warranted where "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)) (internal quotation marks omitted). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. *Pratts*, 94 F.3d at 39. However, if the record before the Court provides "persuasive proof of disability … a remand for further evidentiary proceedings would serve no purpose," and the Court may reverse and remand solely for the calculation and payment of benefits. *See, e.g.*, *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980); *Kane v. Astrue*, 942 F. Supp. 2d 301, 314 (E.D.N.Y. 2013).

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied, and Philips's motion for judgment on the pleadings is granted to the extent it seeks remand. This matter is remanded to the Commissioner of Social Security for further proceedings consistent with this Memorandum and Order. The Clerk of Court is respectfully directed to enter judgment in accordance with this Memorandum and Order and to close this case.

SO ORDERED.

Dated:   Brooklyn, New York
      June 22, 2021

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge